Our next case is Innen against CNH Industrials. Mr. Nemeka. Good morning, Your Honours. May it please the Court. My name is Iker Ibun Nemeka, and I'm here on behalf of the appellant in this case, Mr. Abdulla Innen, and he is appealing from a grant of summary judgment from the district court below that granted summary judgment on behalf of the appellee, CNH Industrial. We believe that the grant of summary judgment was an error, and we ask this court to reverse the grant of summary judgment and send it back to the court below. Innen was employed by CNH. His employment began approximately in the year of 2012. He was one of the supervisors there. Innen is somebody of African origin, specifically Ghana, and he is a black male. Prior to the events that led to his termination, he had a relatively uneventful time there. He wasn't somebody who gave him too many problems, but there was an incident that was complained of that led to the eventual termination of Innen, which was when he was on his way to When his car broke down below freezing temperatures, he tried to get somebody to come out there and pick him up, one of anybody. He called feverishly, and he finally was able to get a hold of one hourly employee who, upon hearing the distress in his voice, decided to come out and pick him up. When the employee got there, Innen's car wouldn't start, so the employee suggested, maybe we should go and get you some gas. Innen said, okay, fine. They got the gas, and the car started, so now Innen was able to return to work. When he got back to work, he was talked to about this situation by at least one supervisor. It wasn't clear that there was any problem at this point. He simply explained that he broke down, and he did what was in his best judgment to do to try to get back to work so his post wouldn't be unattended. So after talking to him about this situation, he wasn't aware that there was any problem. He just continued working. Eventually, Mr. Innen became sick. He became ill, and he requested leave. When he took his leave, while he was gone, for reasons that were stated by CNH, they decided to terminate Innen while he was away. Innen then filed his complaint due to the unlawful termination, and that's where we have ourselves now, Your Honors. Wasn't there the issue about when they made that decision? Yes, Your Honor, there was an issue. They claimed that they made the decision around November the 19th. What day of the week was that, or do you know? November the 19th would have been a Monday. Okay. However, there's no— When did he check out being sick? He left around the 19th also. I guess what I'm trying to figure out is, as I understand it, it was, we'll call it Monday because I wasn't sure, when they had a meeting and went over various violations and decided that he had to be terminated. That's what they said. And I thought it was the next day that he took the sick leave, and that was about the same time they announced the termination. Is that wrong? That's not exactly correct, Your Honor. They did not— What is the timing? They announced the termination to him by writing him the letter that was dated December 1, but when you look at the record, Your Honor, there's no mention either by email or anything that we can see that was generated at the time of the statement to show that termination was even contemplated before December 1. The first time we see termination is in that December 1 letter. Well, do you think then the termination was based on his taking sick leave? We do believe that that was part of it, Your Honor. What's the other part? That they simply were not satisfied with his reaction to some of these complaints that CNH had. Specifically, they felt like he didn't take the right level of responsibility when it came to a previous incident, I believe, in 2015 with the radio, and then the incident that's now being complained of with the car breaking down. So that, combined with his request for leave, is what ended up making them fire him. Did he say something like when one person, I guess a supervisor, goes through a check gate and follow them through so it didn't get registered, is that? And then he said something like they do this all the time, something like that? It's true. They did have the facility, the building, did participate in that CPAT program. Even though they participated in the program, general practice at that building was that supervisors were allowed to have their subordinate employees come in with them so long as the supervisor swiped his badge on entry. So if a supervisor was, quote-unquote, taking responsibility for that hourly employee, this was a policy that did not result in anybody having any adverse action taken against them. Does somebody monitor that? I mean, sometimes like when we come in here, they let judges in without having to use the card because they know who you are. Is that what was going on, or is it something like they do it all the time, but nobody bothers to check? I don't know which that is, but it's an employment practice. It was more so for the convenience of the hourly employees. From my understanding, where the hourly employees parked their cars was quite some distance from where Chavez and Ennin entered into after Chavez went to help Ennin out. So rather than require Ennin, rather than Ennin require Chavez to walk all the way around the building to the other entrance, he thought it best for them to just go ahead and enter in together, especially considering that the practice at that building allowed it. Nobody had ever been warned or punished for it before, so Ennin, in his capacity as a supervisor, didn't see anything wrong with it. So, Counsel, you say that there were two main reasons that Mr. Ennin was fired. One, you believe, based upon the timing of the letter, was because he asked for leave, but you also say that they fired him because they weren't satisfied. I think those were your words. With the way he addressed these issues when they were brought to his attention in that November, I believe, 17th meeting, right? And there's certainly nothing impermissible about their firing him for that reason, right? If they wanted to fire him because they believed that he wasn't meeting, he wasn't owning up to the various errors that they thought he committed, that's not a violation of Title VII or the ADA. And if that is one of the motives, then as long as it's one of the reasons for his firing, isn't that kind of fatal to your ADA claim? Not necessarily, Your Honor. When they say that they don't like his response, that in and of itself isn't a legitimate reason for them to fire him. If they are put off by the way he responded, that doesn't have anything to do with the legitimate expectation of an employer with respect to the employee's duties, which is what we're looking at. But, you know, it's not our role to decide whether or not the firing was a prudent decision or a reasonable decision, right? What we're looking at is whether or not he was fired for some impermissible purpose. And it seems to me that if what you're saying is one of the reasons why the employers fired him was because they weren't satisfied that he was taking responsibility for his role, his supervisory role, that we might disagree with that given the circumstances involved here. He was stranded without a car and it was very cold out. It might not be a wise decision, but that itself wouldn't necessarily trigger a Title VII or an ADA claim, right? Understood, Your Honor. But respectfully, if we look at their dissatisfaction with his response in light of him also taking that FMLA leave, what it tells us is that this is somebody who was fired for taking leave, but he wasn't given any kind of leeway because they felt that the way he was acting wasn't good enough for them. They felt that he should have acted a little bit more contrite or even do something to go along with how they were feeling about him at that time for them to give him any consideration. But because he wasn't showing them that kind of emotional response, then they discriminate against him for not only his disability, but also because he chooses to exercise leave. That's not allowed, Your Honor. If it was simply a case of him not taking responsibility and we fired you, that's fine, but that's not what happened here, Your Honor. They don't like his response, so they said, you know what, we're not going to keep this guy on the job, and he, after everything else, has the gall to take leave. We're going to get rid of him. That's not permissible, Your Honor. That is what makes his termination unlawful. The fact that he had the right to exercise that leave based on his disability and as soon as his leave was approved, then they fired him. The District Court, Your Honor, also erred in summarily excluding a wide range of exhibits that were put forth by Ennin based on the fact that Ennin did not file what's called a sort of reply brief. And why didn't he file a sort of reply brief? I mean, the local rules allowed him to do so, right? You're right, Your Honor. They do allow it, but he's not compelled to do so. They allow for a sort of reply brief, which our circuit has broadly discouraged, actually, the idea of filing sort of reply briefs in that context. However, even if he doesn't file the sort of reply brief, it doesn't relieve the District Court of its responsibility to still look at the evidence he's putting forward and decide whether or not it is admissible evidence. That was where the problem lies, Your Honor. When there's no analysis done, the District Court does not meet its obligation to the litigants. And then, in addition to the exhibits not being looked at, which we believe was definitely inappropriate, we also take issue with the idea that Mr. Ennin was trying to discredit the claims that came about in that December 1st letter. What he was trying to do was offer evidence in rebuttal to some of those claims. These represent issues of fact. They're material to not only the notice that C&H received, but also the reasons for the termination. He offered that evidence in rebuttal, and that should also have been considered by the fact finder. It wasn't appropriate to award summary judgment on that issue. I see my time is up now.  Yes, Your Honor. May it please the Court? Ms. Wilson. May it please the Court? My name is Heather Wilson, and I represent the affilee C&H Industrial America. The District Court properly granted summary judgment in favor of C&H because the admissible evidence shows that no reasonable jury could find for Ennin on his claims. Specifically, the undisputed material facts show that C&H terminated Mr. Ennin only because of his poor judgment. I think you mean terminated his employment. I'm sorry, I misspoke. Terminated his employment. Mr. Ennin is still alive, I think. He is. I apologize, Your Honor. He is certainly still alive. Terminated his employment because he showed poor judgment, he failed to take responsibility for his actions, and he created a risk to an hourly employee's safety. Furthermore, the District Court properly held that Ennin waived the issue of admissibility on certain exhibits by not filing a SIR reply brief. With respect to just a few facts, if I could, my opposing counsel did talk a little bit about his employment with C&H. There was one particular piece that he didn't address specifically, and that was a warning that Mr. Ennin had received in April of 2014, about six months prior to the decision to terminate his employment. In that time period, Mr. Ennin got into a verbal altercation with a third shift supervisor. Mr. Ennin was working the second shift, and so this was a supervisor that was working the next shift after Mr. Ennin, overturning off a radio. His behavior was witnessed by three other employees, including two of his second shift hourly employees. And Mr. Lewis, his supervisor at that time, addressed this issue with him. And he received a written warning for that, and he signed that written warning. And a part of that written warning said as follows, You as a leader on your team should lead by example, and allowing an argument to occur in front of your employees is unacceptable behavior. You're expected to work as a team. We can all agree to disagree, but at no point should you get into a verbal altercation with your co-worker. If at any time you need to address an issue, you should work with your manager to ensure it's dealt with appropriately versus taking it into your own hands. You are in a leadership position, and behavior like this is not acceptable. So Mr. Ennin had been verbally warned and counseled by his direct supervisor about being a leader, showing better judgment in April of 2014. Who was he arguing with? Was it a subordinate or just another supervisor? Your Honor, it was another supervisor. It was a third shift supervisor that he was arguing with. But it was witnessed by individuals that did report to Mr. Ennin when it was brought to Mr. Lewis's attention. So then you fast forward to the November time frame, and November, I believe it was, 17th, Mr. Ennin called Mr. Lewis and reached him, and he told Mr. Lewis that his car had broken down on the way to work, and he would be running late. And at that time, Mr. Ennin testified that he was about five minutes away from the CNH facility in Lebanon, Indiana. And at approximately 2.53 that same day, Mr. Ennin advised Mr. Lewis that he was at work. So Mr. Ennin was supposed to report to work at 2 p.m. That's when his shift started. It was a 2 to 10.30 p.m. shift. So on Tuesday, the next day, November 18th, Ms. Darlen, who is the human resource manager for CNH, received a report that Mr. Ennin had called an hourly second shift employee, Mr. Chavez, and asked him to leave work to bring Ennin some gas but to stay on the clock. And Mr. Chavez was the team lead on that second shift. So what that means is if Mr. Ennin had to do something where he would be off the floor, Mr. Chavez would then be responsible and be supervising in his absence. So Ms. Darlen decided she needed to investigate that report. And so she did confirm, because she has access to when people clock in and clock out, she confirmed that Mr. Chavez had clocked in that day on the 17th at 1.44 p.m., so just about approximately 16 minutes before his shift was supposed to start. But he swiped out of the employee entrance at 2, but he didn't clock back in, and he didn't badge back into the building. So Ms. Darlen decided to talk with Mr. Ennin about what had happened, and Mr. Ennin was interviewed as part of that investigation, as was Mr. Chavez. So after talking with both gentlemen, that happened on the 19th of November, so the day after the 18th that this was brought to her attention, she talks with both of them, and then she and Mr. Lincoln and Mr. Lewis, who were also in these interviews, stayed after and decided, based on the fact that Mr. Ennin called his hourly employee out to help him on a personal issue, leaving the floor without any sort of manager to make sure that it was running correctly, and that he had also allowed him to what we call piggyback into the facility using only Ennin's badge, and he had not gone back and corrected Mr. Chavez's time. He's an hourly employee, so he gets paid for the time that he works, and it showed that he was approximately away from the facility for about 45 minutes, and it was Mr. Ennin's responsibility as his manager to make sure that his time was correct. So for all of those reasons, they also looked at the written warning that he had received six months before, showing similar kinds of lack of leadership and judgment. The decision was made that day to terminate Mr. Ennin's employment, and the idea was that they were going to tell him. You said the 19th that day, you said? Correct, Your Honor. And the decision was made that day, and they also decided they would let him know the following day. The problem was that Mr. Ennin did not report back to work after the 19th, and so they weren't able to have that meeting. So Ms. Darling then, on the 20th, so the day after the decision was made to terminate him, they received notice that Mr. Ennin has called Prudential and requested leave. And so they didn't reach out to him at that point, and it was only after they received notice as to when he was going to be approved for short-term disability, which was December 1, they reached out to him. They felt like they needed to communicate the termination, and that's when Ms. Darling did send the letter of December 1. And in the letter, which is in the record, she specifically says that the decision was made on November 19th and outlines the various reasons why he was terminated for those reasons. So the record is clear that when the decision was made by this group that did the investigation into Mr. Ennin's conduct. Now, Mr. Ennin would like to maybe question that, but there's no admissible evidence before this Court that suggests that that is not what occurred, and we have affidavits from the individuals that did make that decision. Was there some offer to, I guess, agreement that he would be covered for a certain period of time? Yes. In fact, my client actually went out of their way to, you know, allow him to go ahead and have short-term disability. I think his short-term disability was approved through December 14th, and so they allowed him to have all of those benefits, which they didn't have to do. So, yes, he did receive all the benefits that he was entitled to under the short-term disability plan through CNH. With regard to one of the exhibits, I understand your position is that Mr. Ennin waived any of his rights to support or further support or to contest the admission of those exhibits. Exhibit 21 is a e-mail from Stacey Darling to Stephen Lincoln, and I'm just trying to understand what exactly that document says. It says, see below, it looks like his return date will be next Monday, and the e-mail is dated December 1. What did Ms. Darling mean when she said his return date will be next Monday? Does she mean his return to work? That is, and would that be sufficient to create inference that he hadn't been fired as of December 1st? So I'm trying to understand what exactly Ms. Darling meant by that statement. Yes. I don't think that this exhibit, Your Honor, should be used to show an inference that the decision had not been made. I think that she was just, if I'm looking at it right now, I believe that this is an e-mail, it looks like, regarding the short-term disability coverage, and I think she was just pointing out to Mr. Lincoln and Mr. Lewis about the short-term disability decision. So I don't think that there's anything to suggest that the decision hadn't been made. So the return date she's referencing is the return date that was designated by the short-term disability administrator. Exactly, Your Honor. So if you look just briefly at the various claims that Mr. Enan has presented, the Title VII and Section 1981 claims, you know, this claim fails for several reasons. First of all, Mr. Enan did not satisfy his prima facie case under the McDonnell-Douglas method. First of all, he did not exercise good judgment. He was not performing to the legitimate expectations of CNH for the things I've already mentioned that happened in April and then also the November incident. He also cannot point to anyone who was similarly situated to him that was treated more favorably. And then finally, and I think probably most importantly, he can't show that CNH's legitimate nondiscriminatory reason was somehow a pretext. You know, he will disagree, certainly, as to our reasons, but that's a very high threshold. As this Court knows, he has to show basically it was a lie and that CNH did not honestly believe the reasons for the termination. With respect to the ADAAA discrimination claim, just to pick up on something Judge Lee mentioned, that burden is a but-for standard based on the Surwatka case. And so Mr. Enan has to show that his disability, his alleged disability, was the but-for reason for his termination. And you've heard today that there certainly was an admission that there were other reasons for that termination, so I think that was fatal to his claim. There's also an argument that the District Court agreed with that he was not even disabled. Mr. Enan's own testimony, he stated that he became disabled when he had his surgery. Well, the surgery did not occur until after the decision was made to terminate his employment, so he was not disabled at the time of his termination. And we've cited in our brief and his testimony to suggest that he wasn't disabled even when he had his surgery, given that he was limited for such a short period of time. For example, couldn't play soccer or have sex for one month, and it affected his bowel movements for one month. So we don't believe that Mr. Enan has even proven that he is disabled under the statute. With respect to the failure to accommodate claim, Mr. Enan was given every leave that he asked for. He never asked for any other type of accommodation. I think Mr. Enan's argument is somehow we should have forgiven as an accommodation for his acts that occurred on November 17th, and that's not what an ADAA failure to accommodate claim is about. And then finally, the FMLA claim, there's two pieces of that, the interference and the retaliation. The interference, we gave him every FMLA leave that he requested, and he can't show, again, for the reasons I've already stated, that his FMLA, he was retaliated against for taking his FMLA. We didn't even know that he had requested that until the day after the decision was made to terminate him. Finally, there's three claims that Mr. Enan sort of has in his brief. The Section 1985, 86, and negligent supervision, he doesn't cite any statute or testimony to support those, and so we think the district court, you should affirm the district court grant of summary judgment on those claims. So for all of those reasons, C&H would respectfully request that this court affirm the district court's decision on summary judgment on all of Mr. Enan's claims. Thank you, counsel. The case is taken under advisement. Our next case for argument this morning...